# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION AT COLUMBUS

KANDLE MESSENGER,

              Petitioner,         :      Case No.  2:24-cv-01176

    - vs -                       District Judge Algenon L. Marbley
                                     Magistrate Judge Michael R. Merz

WARDEN, Noble Correctional
  Institution,

                                        :
              Respondent.

# REPORT AND RECOMMENDATIONS

This is a habeas corpus case pursuant to 28 U.S.C. § 2254 brought by Petitioner Kandle Messenger with the assistance of counsel to obtain relief from his conviction in the Franklin County Court of Common Pleas.  The case is pending on the Petition (ECF No. 1), the State Court Record (ECF No. 4), the Return of Writ (ECF No. 5), and Petitioner's Traverse[1] (ECF No. 10). The Magistrate Judge reference in this case was recently transferred to the undersigned to help balance the Magistrate Judge workload in the District (ECF No. 11).

---

[1] Petitioner's counsel has used the older term "traverse" for the pleading which functions as a reply under the Rules Governing § 2254 Proceedings.

**Litigation History**

On March 7, 2019, a Franklin County grand jury indicted Petitioner on one count of purposeful murder in violation of Ohio Rev. Code § 2903.02, and one count of felony murder in violation of Ohio Rev. Code § 2903.02, with an underlying offense of felonious assault, in violation of Ohio Rev. Code § 2903.11. Both charges contained accompanying three-year firearm specifications under Ohio Rev. Code § 2941.145(A)(Indictment, State Court Record, ECF No. 4, Ex. 1).

At trial Messenger testified in his own defense and asserted the defense of self-defense, but admitted shooting the victim fourteen times. A jury found Petitioner guilty on both counts and firearm specifications. The trial judge merged the counts of conviction and sentenced Petitioner to an aggregated term of eighteen years to life imprisonment.

Messenger appealed to the Ohio Court of Appeals for the Tenth District which affirmed. *State v. Messenger*, 2021-Ohio-2044 (Ohio App. 10th Dist. Jun. 17, 2021). Petitioner appealed further to the Ohio Supreme Court which accepted jurisdiction only on Petitioner's first proposition of law and then affirmed the conviction. *State v. Messenger*, 171 Ohio St. 3d 277 (2022).

Messenger then filed his Petition in this Court, pleading through counsel the following grounds for relief:

> **Ground One**: Petitioner's rights to due process and a fair trial were violated when the trial court entered a judgment of conviction based on insufficient evidence in violation of petitioner's rights under the United States Constitution.
>
> **Ground Two:** Petitioner was denied his rights to the presumption of innocence, to a fair trial and to due process contrary to the United

States Constitution when the jury heard evidence of petitioner's incarceration prior to trial.

**Ground Three:**  Petitioner's trial counsel was ineffective in failing to properly preserve meritorious claims.

(Petition, ECF No. 1).

# Analysis

### Ground One:  Insufficient Evidence to Negate Claim of Self-Defense

### Messenger's argument as stated in the Petition

In his First Ground for Relief, Messenger contends the State failed to produce sufficient evidence to overcome his claim that he acted in self-defense when he shot Richard Pack to death on February 25, 2019.

The relevant actors and their relationships as described by the Tenth District Court of Appeals are as follows:  Richard Pack, the decedent, and Kandle Messenger, the defendant, were stepbrothers who once lived together at 2065 West Mound Street in Franklin County, Ohio.  At some point in time that address became the home of Pack and Samantha Anderson who were in a relationship that had produced two children.  About a year after Pack and Samantha and their children moved in, they were joined by Samantha's sister, Breanna Anderson, and her fiancée, Tiffany Wiseman.  Messenger, whom the Tenth District found was in a "romantic relationship" with a Sandra Gheen in early 2019, had moved back into the residence.  Then Pack and Samantha broke up, Pack moved out, and Gheen moved out.  However Samantha testified at trial that she had begun a "secret relationship" with Messenger while all three couples lived in the house.

Gheen testified she learned of the Samantha-Messenger relationship from reading texts on

Messenger's phone in which Samantha expressed her desire to marry Messenger.  Gheen conveyed this information to Pack which led to the confrontation of Pack and Messenger and the shooting. From that point the Tenth District summarizes the trial testimony:

> [*P6] Samantha testified that around mid-afternoon on February 25, 2019, after Pack saw the text messages between herself and Messenger, he asked to talk to Samantha about the infidelity. After about ten minutes of conversation with Pack, Samantha said that Messenger arrived at the residence. Samantha testified that when Messenger came in the room, Pack asked Messenger to have a seat and then Pack began hitting Messenger. Samantha said Messenger did not attempt to fight back during this altercation, and Pack eventually left the home. Samantha said she did not see either Messenger or Pack with a weapon during this fight. Messenger did not require medical attention from this interaction, and Samantha stated no one present called 911. Prior to this incident, Samantha said she had never seen a physical fight between Pack and Messenger.

> [*P7] Later in the evening on February 25, 2019, Samantha said Pack returned to the West Mound residence and "hop[ped] the fence" into the yard. (Tr. at 188.) Samantha testified that Messenger was already outside at this point, and she was sitting in her car when Pack approached her vehicle to talk more about their relationship. She described Messenger as keeping his distance but observing the interaction between Pack and herself. Eventually, Samantha said she agreed to go inside and continue talking to Pack.

> [*P8] Samantha described Pack attempting to get Messenger to come inside with them but that Messenger initially refused. Once Messenger agreed to come in the house, Samantha said Pack shut and locked the door, at which time Samantha said she went upstairs to check on her children. Samantha explained that the only way to get the door in the house to close was to lock it. While she was upstairs, Samantha said she heard Messenger say "[Pack], stop. [Pack], don't. Don't come any closer. Please, [Pack], I'm begging you. [Pack], stop," followed by gunshots, and she came back downstairs to find Messenger holding a gun. (Tr. at 206.) Samantha testified she then called 911, and the state played an audio recording of her 911 call for the jury. In the 911 call, Samantha told the dispatcher that Pack had been shot and that Messenger was the one who shot him, but she also told the dispatcher that Pack beat her before backtracking and saying Pack beat Messenger prior to the shooting.

4

[*P9] Additionally, Samantha testified that Pack worked as an armed security guard and, as a result, had a "good knowledge of firearms." (Tr. at 209.)

[*P10] Rebecca Lape lived next door to 2065 West Mound, and she testified that on February 25, 2019 around 9:00 p.m. she heard people arguing outside, so she looked out her window and saw Pack yelling back and forth with someone in a car. Rebecca testified that she saw Messenger approach Pack several times before Pack yelled, with his arms up, "if you're going to do it, just do it." (Tr. at 225.) She then heard Pack say "you ain't going to do nothing. Just put it away." (Tr. at 237.) After that, Rebecca said she watched go inside the house but that he did not close the door behind him. Messenger was still outside the house when Rebecca stopped looking out her window. She also noticed Pack's children looking out the window of their house at the altercation. Rebecca testified she did not see Messenger with a gun while he was outside the house. About "a minute or two" after she stopped looking out the window, Rebecca said she heard what sounded like five gunshots. (Tr. at 239.)

[*P11] John Lape, Rebecca's husband, testified that around 9:00 p.m. on February 25, 2019, he heard a commotion outside and went to look out a different window than his wife. John said he saw Pack next to Samantha's car and Messenger was standing outside. He thought he heard Pack say "shoot me," and he saw Pack standing with his hands up. (Tr. at 244.) After his wife walked away from the window, John said he went to look out the window where Rebecca had been standing. By that time, John said Pack and Samantha were no longer outside but that Messenger was still standing there. John testified that he watched Messenger "[take] off on, like, eight long steps, went inside the door. The door was already open. Slammed the door and (witness clapped his hands five times). That's it." (Tr. at 246.) John testified he heard the gunshots immediately after Messenger went inside the house, and he testified he saw Messenger close the door.

[*P12] Breanna testified she still lived with her sister at the West Mound residence on the day of the February 25, 2019 shooting. Breanna testified that she had previously dated Messenger years earlier but that he had always been "obsessed" with Samantha. (Tr. at 277.) She stated that Messenger used to collect hair from Samantha's hairbrush and keep it in his pockets. Further, Breanna testified that her relationship with Messenger did not end well.

[*P13] Breanna testified that she was at the West Mound residence when the shooting occurred but that she did not see it, only "heard some things." (Tr. at 258.) However, Breanna testified that she did see the fight earlier in the day on February 25, 2019 between Pack and Messenger. Breanna said that during this fight, she saw Pack standing in front of the couch yelling at Messenger, but she did not see anyone hit anyone else.

[*P14] Breanna's fiancée, Wiseman, was also at the residence at this time, and she testified that she did see Pack "beating on" Messenger while Messenger sat on the couch. (Tr. at 287.) Prior to that time, Wiseman said she had never seen Pack be violent toward Messenger, but she was not surprised by his reaction given the recent revelation that Messenger and Samantha were romantically involved. Wiseman testified the physical altercation did not appear to be serious at the time.

[*P15] According to Wiseman's testimony, she had let Messenger borrow her phone after his altercation with Pack, and she went to retrieve it from him later in the evening on February 25, 2019. When Messenger returned her phone, Wiseman said she saw that he had his gun on his hip. Once she was back in the basement, Wiseman said she received a phone call from Gheen asking to speak to Messenger. Wiseman testified she found Messenger again, this time outside the back door of the house, and Messenger was outside with Pack again. On cross-examination, Wiseman testified that she saw Messenger with his gun pulled out and pointed at Pack in the backyard. Wiseman said Messenger and Pack were arguing, but that she went back inside the house and returned to the basement. From the basement, Wiseman said she heard Messenger say "no, [Pack], don't," followed by "a bunch of gunshots." (Tr. at 297.) Wiseman described the gunshots as being "too many to count." (Tr. at 304.) She did not hear Pack say anything.

[*P16] When she heard the gunshots, Breanna said she was in the basement with Wiseman. Breanna testified that she heard Messenger say "no, [Pack], don't," followed by "way more gunshots than needed to be." (Tr. at 273.) Breanna described the gunshots as all occurring quickly without any pause in between them.

[*P17] After hearing the gunshots, Wiseman said Messenger yelled for her because he wanted to use her phone again. Wiseman said when she went upstairs to give Messenger her phone, she saw Messenger holding his gun, standing between Pack and the back door.

6

[*P18] The parties stipulated to the forensic evidence, including that Pack was shot 14 times. At the close of the state's evidence, defense counsel moved for an acquittal under Crim.R. 29, arguing the state had not met its burden to prove that Messenger did not act in self-defense when he shot Pack. The trial court denied the motion.

[*P19] Gheen testified as a witness for the defense. Gheen testified she had moved out of the West Mound residence in January 2019 and did not personally witness the events of February 25, 2019. Earlier in the day on February 25, 2019, Gheen said she repeatedly sent text messages to Pack expressing her frustration with Messenger.

[*P20] Messenger testified in his own defense. According to his testimony, Messenger had always had a good relationship with Pack, whom he had known since he was eight years old, until Pack learned of Messenger's relationship with Samantha. Messenger testified that he understands that Pack had a right to be angry with him, and that he felt ashamed for betraying his stepbrother.

[*P21] On February 25, 2019, Messenger said he entered the West Mound residence to find Samantha and Pack together, and he could tell Samantha had been crying. Messenger testified that Pack said, "I'm going to lock this door so nobody tries to leave," which left Messenger feeling "very nervous." (Tr. at 379.) Messenger said Pack asked him to sit down on the couch and then confronted him about his suspicion that Messenger and Samantha had been "messing around" behind his back. (Tr. at 380.) Believing Pack already knew the answer, Messenger said he dropped his head in shame and could not look at Pack. When Samantha then answered the question for him, Messenger said Pack started hitting him on the left side of his face. Messenger said Pack continued to hit him until one of his young sons came in the room, at which point Pack said "I'm done. I'm not going to hit you no more." (Tr. at 381.) Samantha left the room to tend to her child, and Messenger said Pack paced back and forth while repeatedly saying "I should kill you. I should keep hitting you." (Tr. at 381.) Messenger testified that Samantha tried to leave the house but that Pack slammed the door, pushed Samantha on the couch, and told her "you're not going anywhere." (Tr. at 381.) According to Messenger, Pack then showed him the text messages he had received from Gheen revealing Messenger's and Samantha's relationship. After returning the phone to Pack, Messenger said Pack told them he was going to kill himself, and then Pack left the West Mound residence.

[*P22] Messenger testified that after Pack left the house, he went upstairs to get his gun because he knew Pack owned several firearms and Messenger "could tell [Pack] was upset," so he wanted to be prepared to defend himself. (Tr. at 382.) Messenger stated he did not have a concealed carry permit and he normally carried his firearm openly in a holster, but for some reason that day he placed it in the waistband of his pants. Because Pack was an armed security guard, Messenger said Pack had taught him self-defense techniques, including the quickest way to draw a firearm and how to disarm another person.

[*P23] "Many days prior" to Pack confronting him, Messenger testified that he believed Pack suspected Samantha was being unfaithful, and he said Pack would tell him he would "kill the person that she left him for and then her afterwards." (Tr. at 384.) Though Messenger admitted he did not take Pack seriously at the time he said those things, he testified that he started to feel differently after Pack hit him on February 25, 2019. After Pack punched him, Messenger said he was afraid Pack might kill him or Samantha.

[*P24] Once Pack left the house, Messenger testified he called Pack multiple times to apologize and to encourage him not to take his own life. During one of these phone calls, Messenger said Pack told him "if you have any respect for me, you need to leave [Samantha] the hell alone," and Messenger said he would, though he admitted he did not really intend to end his relationship with Samantha. (Tr. at 387.)

[*P25] Later that evening, Messenger said he was in the backyard when he saw Pack climbing over the fence. Messenger said he "immediately start[ed] backpedaling" and ran backward. (Tr. at 387.) According to Messenger, Pack was approaching him very quickly, so Messenger testified he drew his firearm which caused Pack to stop approaching. Messenger said Pack then approached Samantha's car and turned to Messenger to ask, "are you going to shoot me?" (Tr. at 388.) Messenger said he told Pack he did not want to shoot him, that Pack told him to put his gun away, and that Messenger complied and returned the gun to his waistband.

[*P26] Messenger testified he could not hear what Pack was saying to Samantha while she was in her car but that Pack eventually said he wanted everybody to go inside. Messenger said he did not think Samantha wanted to go inside but that he heard Pack tell her that if she did not go in the house he was going to break the windows on her car. According to Messenger, Samantha then went inside the house, and Pack asked Messenger to come inside, too. Messenger

8

said he told Pack "I don't want to come in the house. I don't trust you. I can't come in the house. I don't feel safe." (Tr. at 390.) Messenger testified that he continued to resist going in the house until Pack said to him, "if you think that gun's stopping me from coming out there and getting you, you're wrong." (Tr. at 390.) Eventually, Messenger said he agreed to go inside the house if Pack went all the way to the front door so that Messenger could maintain some distance from him and "feel safe." (Tr. at 390.)

[*P27] Messenger testified that once he could see that Pack was over by the front door, Messenger went inside the house and locked the back door behind him. During this interaction, Messenger said he had not seen Pack carrying a gun, a knife, or a club, and he said Pack was not wearing a coat. Messenger said that Pack's youngest son was in the room and that Samantha told her son to go upstairs. Pursuant to Messenger's testimony, by the time the child went upstairs, Pack had "cut the distance we had in half already" and was standing in the middle of the room. (Tr. at 392.) Messenger said he took a step back and that Pack said he just wanted to give him a hug. Messenger said Pack had his hands out and kept approaching him, backing Messenger into a corner and repeating that he just wanted to hug Messenger. By the time Pack was within arm's reach of him, Messenger said he told him "[Pack], stop. Please stop," three or four times. (Tr. at 393.) Messenger said he believed Pack was going to attempt to take his gun because he knew Pack was trained in doing so. At that point, Messenger testified he "fire[d] [his] gun as fast as humanly possible * * * because I believe that I have waited too long at this point," and that he "was hoping in some way that [he] could stop [Pack] from taking this gun from" him. (Tr. at 393.) Messenger said that at the time he thought he had fired five or six rounds but that he has since learned he fired many more, and he also testified he did not know whether he was hitting Pack or not when he fired. On redirect examination, Messenger testified he was no longer afraid that Pack might be armed when he was approaching him in the room, but he was afraid that Pack would try to take his own gun.

[*P28] Messenger admitted that he initially told the detective after the shooting that Pack may have moved back after the first shot, but he testified that he had a headache and was just trying to cooperate with police. At trial, Messenger maintained that he felt he was in danger the entire time. Messenger said he believed Pack would stop approaching when drew his gun and that he was "stunned" that Pack did not stop approaching. (Tr. at 398.) Messenger additionally testified he was trying to aim while he shot but that he was "in panic mode," and that he stopped firing once Pack fell to the ground. (Tr. at 395.) After the shooting, Messenger said Samantha called 911 and

he used Wiseman's phone to call his friend. Messenger said he then placed the gun on the table for police to find and waited with his hands in the air until police arrived.

[*P29] On cross-examination, Messenger testified that he was still in a relationship with Samantha and that Samantha had expressed that she intended to stand by his side throughout the trial. Messenger agreed that the altercation earlier in the day on February 25, 2019 between himself and Pack was minor enough that he did not even realize he had been injured or that it left his lip bleeding, yet maintained it was sufficient for him to be scared for his safety. Messenger testified he retrieved his gun following that altercation not because he was afraid that Pack would hit him again but because he was afraid Pack would also come back to the house with a gun. Messenger agreed he never saw Pack armed that day, that Pack never threatened to come back with a gun, that he could visibly see Pack did not have a gun unless he was concealing it in his underwear or under his t-shirt, and he said he learned after the fact that Pack did not have a gun on him at the time of the shooting. Messenger also agreed on cross-examination that Pack approached him slowly in the house with his arms out in front of him the entire time, and Messenger started shooting when Pack was just beyond arm's length away. Further, Messenger agreed he willingly went inside the house when Pack asked him to come in. He also agreed that neither Rebecca, John, nor Samantha testified that they heard Pack tell Messenger that the gun was not going to stop him from grabbing Messenger. Finally, Messenger agreed that he told police the night of the shooting that Pack went backward after the first shot but that Messenger continued to shoot until Pack fell.

*State v. Messenger, supra.*

Respondent presented this recitation of facts in the Return as a set of binding factual findings (Return, ECF No. 5, PageID 1109-16). Petitioner does not generally object to these findings, but instead asserts "Messenger incorporates by reference the facts set forth in his Petition, and pertinent facts will be incorporated within each of the claims for relief below." (Traverse, ECF No. 10, PageID 1165). The Petition also quotes the Tenth District's findings (Petition, ECF No. 1, PageID 2-9). Messenger also verified the Petition. *Id.* at PageID 36. Note, however, that to the extent, if any, that Petitioner's account of the facts differs from what the Tenth District found, the

10

Court is bound by the record before the Tenth District. *Cullen v. Pinholster,* 563 U.S. 170 (2011).

On the basis of these fact, Messenger argues in the Petition that the State failed to prove him guilty beyond a reasonable doubt. He explicitly recognizes that the Ohio courts decided this issue on the merits and that he can prevail only if he can show that that decision was objectively unreasonable (Petition, ECF No. 1, PageID 15, citing *Tibbs v. Florida*, 457 U.S. 31, 45 (1982); *Jackson v. Virginia*, 443 U.S. 307 (1979); and *Sanborn v. Parker*, 629 F.3d 554, 577–78 (6th Cir. 2010)).

The objective reasonableness of the decision is to be measured against clearly established law as found in the holdings of United States Supreme Court precedent. 28 U.S.C. § 2254(d)(1); *Harrington v. Richter*, 562 U.S. 86 (2011); *Cunningham v. Shoop,* 23 F.4th 636, 650 (6th Cir. 2022); *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry) v. Taylor,* 529 U.S. 362, 379 (2000); *Hendrix v. Palmer*, 893 F.3d 906, 917 (6th Cir. 2018). Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Petitioner makes clear this Ground for Relief is related only to his claim of self-defense. Messenger's due process rights were violated "because the State did not produce "sufficient evidence to disprove Messenger's self-defense claim beyond a reasonable doubt." (Petition, ECF No. 1, PageID 16). Having made that statement, however, he quotes *In re Winship,* 397 U.S. 358, 364 (1970), as stating "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Id.* Because under Ohio law the State must disprove self-defense, he argues "the absence of self-defense is a fact necessary to constitute the crime with which a defendant may be charged."

11

*Id.*

He admits the Supreme Court has allowed States to place the burden of proof of an affirmative defense on the defendant, noting that in *Patterson v. New York*, 432 U.S. 197 (1977), the Court had upheld Pennsylvania's requirement that a defendant claiming he was under extreme emotional distress when he killed another prove that defense by a preponderance, distinguishing *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975), where it invalidated a Maine requirement that a defendant prove provocation in order to reduce a murder charge to manslaughter. *Id.* at PageID 16-17. He concludes "[t]he implication from *Mullaney* and *Patterson* is that, where an affirmative defense negates the elements of the crime the prosecution must prove, Due Process requires the prosecution to disprove that defense," citing *Smith v. United States*, 568 U.S. 106 (2013), where the Court upheld a federal requirement that the defense of withdrawal from a conspiracy by proved by the defendant. Petitioner summarizes his argument as follows:

> Self-defense is explicitly made a lawful act in R.C. 2901.05(B)(1) as it provides that "[a] person is allowed to act in self-defense." A person acting in self-defense cannot be acting purposely as that term is defined in R.C. 2901.22: "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." Based on this definition of purposely, there can be no intent to kill under R.C. 2903.02(A) unless an offender has the "specific intention to" kill. Since, again, self-defense is a lawful act in Ohio, it negates the element of "purposeful." The prosecution cannot prove "purposely" without, in effect, disproving the self defense evidence; in other words, the State must prove that the offender's actions crossed the line from the lawful act of self-defense to the unlawful act of specifically intending to kill someone.

*Id.* at PageID 18.

Petitioner next argues that he was not at fault for creating the situation in which the shooting took place. *Id.* at PageID 19-21. He then asserts he "had a reasonable and honest belief that he

was in imminent danger of death or great bodily harm and his only means of escape was using deadly force." *Id.* at PageID 21-23. Finally he asserts he had no duty to retreat, an issue not dealt with by the Tenth District. *Id.* at PageID 23.

### Respondent's Position as Stated in the Return

Respondent asserts the first ground for relief is not cognizable in habeas corpus because "the Ohio Supreme Court concluded that self-defense was not subject to a sufficiency of evidence standard." (Return, ECF No. 5, PageID 1127).

### Petitioner's Position as Stated in the Traverse

Petitioner eschews presenting a separate statement of facts in the Traverse, but relies on the Petition (Traverse, ECF No. 10, PageID 1165). However, in arguing this First Ground for Relief, he quotes the summary of facts from the decision of the Ohio Supreme Court. *Id.* at PageID 1177-78, quoting *State v. Messenger,* 171 Ohio St. 3d 227, 228–29 (2022). Then he proceeds for five pages to report his own version of the facts. *Id.* at 1179-83.

He then argues that the Ohio Supreme Court's decision in this case is contrary to clearly established Supreme Court law:

> "The State is foreclosed from shifting the burden of proof to the defendant only 'when an affirmative defense does negate an element of the crime.'" Smith v. U.S., 568 U.S. 106, 110 (2013) (quoting *Martin v. Ohio*, 480 U.S. 228, 237 (1987) (Powell, J., dissenting)); see also *Patterson v. New York*, 432 U.S. 197, 206–07 (1977). Clearly established Supreme Court precedent has invalidated state attempts to shift the burden of proof to a defendant for an essential

13

> element of a crime. See *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975).
>
> The Supreme Court of Ohio's decision affirming Messenger's conviction is contrary to this clearly established federal law.

*Id.* at PageID 1184.

**Analysis**

The Magistrate Judge disagrees with Petitioner's conclusion.  It is certainly correct that the Ohio General Assembly has placed the burden of proving the absence of self-defense, in a case where it is appropriately raised, on the State by proof beyond a reasonable doubt.  But the Ohio General Assembly has authority to set the burden of proof on any fact required to be shown in court, so long as it does not attempt to interfere with the duty of the State to prove every element of a crime by proof beyond a reasonable doubt.  The "beyond a reasonable doubt standard" is a constitutional minimum, imposed on the States by the Fourteenth Amendment.  *Jackson, supra.* The same constitutional minimum applies without any action by the General Assembly to criminal offenses established by municipal ordinance.  A State or municipality cannot criminally punish anyone without producing proof of guilt of every element of the offense beyond a reasonable doubt.

Although the Due Process Clause sets a constitutional minimum, it does not set a maximum.  There is no rule of constitutional law which forbids a State from imposing the beyond a reasonable doubt requirement on other facts which are required to be proved in a criminal trial. For example, although it has not done so, nothing in the United States Constitution would prevent the General Assembly from requiring that proper venue be proved beyond a reasonable doubt in a criminal case.

Although the General Assembly substantially liberalized self-defense law with the enactment of H.B. 228, it did not make the absence of self-defense an element of the crime of purposeful murder.  Rather it provided that when a defendant meets his burden of production of some evidence of self-defense, the State must defeat that evidence with proof beyond a reasonable doubt.  There is no dispute between the parties that Messenger produced enough evidence to satisfy this burden of production.  Once he had done so, the burden of disproving that defense by proof beyond a reasonable doubt shifted to the State as a matter of substantive state criminal law, not federal constitutional law.

The General Assembly could, of course, have made the absence of self-defense an element of the crime, but did not do so.  The crime of which Messenger was convicted was a violation of Ohio Revised Code § 2903.02(A) which provides "No person shall purposely cause the death of another . . . ."  If the General Assembly had intended to make the absence of self-defense an element of crime of intentional murder, it could have written "Except when acting in self-defense, no person shall purposely cause the death of another."  Instead, the change in self-defense law is at Ohio Revised Code § 2901.05:

> (A) Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance pf the evidence, for an affirmative defense other than self-defense, defense of another, or defense of the accused's residence presented as described in division (B)(1) of this section, is on the accused.
>
> (B) (1) A person is allowed to act in self-defense, defense of another, or defense of that person's residence.  If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the

prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

The interpretation given here is completely consistent with that given H.B. 228 by the Ohio Supreme Court in this case.  In a decision expressing the unanimous agreement of the court, Justice Donnelly wrote:

¶ **14** A self-defense claim includes the following elements:

(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

* * *

¶ 17 Reasonable doubt is "the condition of mind produced by the proof resulting from the evidence in the cause. It is the result of the proof, not the proof itself * * *; thus one is a cause, the other an effect." *Coffin v. United States*, 156 U.S. 432, 460, 15 S.Ct. 394, 39 L.Ed. 481 (1895). Reasonable doubt speaks to the extent to which the fact-finder must be convinced that a party met its burden of persuasion. *State v. Robinson*, 47 Ohio St.2d 103, 107-108, 351 N.E.2d 88 (1976); *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The reasonable-doubt standard does not apply to whether a party has met its burden of producing legally sufficient evidence in the first place; if a party fails to meet its burden of production, the fact-finder cannot consider the claim at all, let alone how persuasive the evidence was. *See Burks v. United States*, 437 U.S. 1, 16, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (reversal for insufficient evidence "means that the government's case was so lacking that it should not have even been *submitted* to the jury" [emphasis sic]).

¶ 18 The state has the burden of production regarding the elements of a criminal offense because an accused person has the right to a presumption of innocence on each element. R.C. 2901.05(A); *Morissette v. United States*, 342 U.S. 246, 275, 72

S.Ct. 240, 96 L.Ed. 288 (1952); *Jackson*, 443 U.S. at 315, 99 S.Ct. 2781, 61 L.Ed.2d 560. The presumption of innocence "is an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created." *Coffin* at 459, 15 S.Ct. 394.

¶ 19 Conversely, there is no due-process right to a presumption of an affirmative defense such as self-defense. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 37; *see also Leland v. Oregon*, 343 U.S. 790, 798-799, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (legislative allocation of the burden of proving the affirmative defense of insanity does not raise a constitutional issue, because the affirmative defense is not constitutionally based). There is also no statutory right to a presumption of self-defense in Ohio. R.C. 2901.05(A) provides that an accused is "presumed innocent," in line with the constitutionally guaranteed right. But R.C. 2901.05(B) states that "[a] person is *allowed* to act in self-defense." (Emphasis added.) With no "proof created by the law in favor of" self-defense, *see Coffin* at 459, 15 S.Ct. 394, the defendant has the burden of producing legally sufficient evidence of self-defense to trigger the state's duty to overcome that evidence.

¶ 20 Although there is no explicit presumption of self-defense in R.C. 2901.05(B)(1), Messenger nonetheless maintains that H.B. 228's amendment to the statute eliminated the defendant's burden of production regarding self-defense. He notes that former R.C. 2901.05(A) stated that a defendant had the affirmative "burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense," *see* 2008 Sub.S.B. No. 184, but the new standard specific to self-defense in R.C. 2901.05(B)(1) uses passive language and triggers the state's duty to disprove self-defense so long as "there is evidence presented that tends to support that the accused person used the force in self-defense." He contends that the vagueness of the new language in R.C. 2901.05(B)(1), coupled with the state's new burden of persuasion, indicates that the absence of self-defense is now an element of all applicable offenses and that the state has the burden of production. We disagree.

¶ 21 The plain language of R.C. 2901.05(A) reflects that self-defense is still an affirmative defense and that the burden of production is still on the defendant:

The burden of going forward with the evidence of an *affirmative defense*, and the burden of proof, by a

preponderance of the evidence, for an *affirmative defense other than self-defense*, defense of another, or defense of the accused's residence presented as described in division (B)(1) of this section, is upon the accused.

(Emphasis added.) By stating that the burden of persuasion is on the defendant for "an affirmative defense other than self-defense," the statute indicates that self-defense falls within the category of affirmative defenses but is excepted from the burden of persuasion. And by stating that the defendant bears the "burden of going forward with the evidence of an affirmative defense," the statute indicates that there are no exceptions to the defendant's burden of production regarding affirmative defenses.

¶ 23 The law defining the murder offenses charged against Messenger remained the same before and after H.B. 228's amendment to R.C. 2901.05:

(A) No person shall purposely cause the death of another or the unlawful termination of another's pregnancy.

(B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

¶ 24 The change to the state's burden of persuasion regarding self-defense in R.C. 2901.05(B)(1) did not change the elements of Messenger's charged offenses of murder and felony murder. A statutory requirement that the state must disprove an affirmative defense beyond a reasonable doubt does not in itself cause the affirmative defense to become an element of the offense. *Engle v. Isaac*, 456 U.S. 107, 120, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Self-defense remains an affirmative defense in Ohio, and an affirmative defense is not an element of a crime, *see Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, at ¶ 35.

Federal courts are obliged to accept state court interpretations of state law. *Railey v. Webb*, 540 F.3d 393 (6th Cir. 2008), *quoting Bradshaw v. Richey,* 546 U.S. 74, 76 (2005). Accepting the Ohio Supreme Court's interpretation of the applicable state law, the same interpretation the undersigned would give if deciding that question *de novo*, the Ohio court's decision on Ground

18

One is neither contrary to nor an objectively unreasonable interpretation of United States Supreme Court precedent. Ground One should be dismissed on the merits.

**Ground Two: Denial of Presumption of Innocence by Revealing Pre-trial Incarceration**

In his Second Ground for Relief, Messenger asserts he was denied the presumption of innocence by revelation to the jury that he was incarcerated prior to trial. Messenger raised this as his Third Assignment of Error on appeal and the Tenth District decided it as follows:

> ¶ 59 In his third assignment of error, Messenger argues the trial court erred in admitting evidence of his incarceration prior to trial. More specifically, Samantha testified she continued to visit Messenger while he was in jail awaiting trial, and the state introduced a record of her 59 visits with Messenger between March 4 and October 28, 2019. Messenger asserts this evidence interfered with his presumption of innocence. As Messenger concedes, however, his counsel did not object to this evidence at trial, and thus our review is limited to plain error. *Hughes* at ¶ 28, citing *State v. Jackson*, 92 Ohio St.3d 436, 444 (2001), citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus; Crim.R. 52(B). An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar,* 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

> ¶ 60 For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

> ¶ 61 Messenger argues the admission of the evidence of Samantha's many visits with Messenger while he was incarcerated prior to trial was not relevant and was unfairly prejudicial, serving only to erode his presumption of innocence. However, the state introduced this evidence to demonstrate that Samantha and Messenger were still in a romantic relationship and to cast doubt on her assertion that she

19

> had not discussed the trial or her planned testimony with Messenger prior to trial. Though Messenger argues the potential evidentiary value of informing the jury of the frequency of Messenger's and Samantha's communication does not outweigh the prejudice it caused him by the jury learning of his incarceration, the trial court fully explained the presumption of innocence in the jury instructions. "A jury is presumed to follow a trial court's instructions." *Jones* at ¶ 64 (noting that "[e]vidence about a defendant's arrest and ensuing custody does not contravene the presumption of innocence," and "[w]hile no specific curative instruction was requested or provided, the trial court fully explained the presumption of innocence in the jury instructions"), citing *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, ¶ 75, and *State v. Trewarth*a, 10th Dist. No. 05AP-513, 2006-Ohio-5040, ¶ 21. Thus, Messenger cannot demonstrate any error, let alone plain error, from the admission of this evidence. We overrule Messenger's third assignment of error.

*State v. Messenger,* 2021-Ohio-2044 (Ohio App. 10th Dist. Jun. 17, 2021)(copy at State Court Record, ECF No. 4, Ex. 8).

Respondent asserts that merits review of this claim is barred by Messenger's failure to make a contemporaneous objection and that the claim is not cognizable because state court evidentiary rulings do not rise to the level of constitutional violations (Return, ECF No. 5, PageID 1135-40).

Messenger responds by asserting his procedural default is excused by the ineffective assistance of trial counsel in failing to make the objection (Traverse, ECF No. 10, PageID 1188). He argues further that admitting evidence of his pre-trial incarceration rendered his trial unfair. *Id.* at PageID 1189-90.

**Analysis**

The procedural default doctrine in habeas corpus is described by the Supreme Court as

follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional rights claim he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107, 110 (1982). "Absent cause and prejudice, 'a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review.'" *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000), quoting *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle*, 456 U.S. at 110; *Wainwright*, 433 U.S. at 87.

> [A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule. E.g., *Beard v. Kindler*, 558 U.S. 53, 55, 130 S.Ct. 612, 175 L.Ed.2d 417 (2009). This is an important "corollary" to the exhaustion requirement. *Dretke v. Haley*, 541 U.S. 386, 392, 124 S.Ct. 1847, 158 L.Ed. d 659 (2004). "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address" the merits of "those claims in the first instance." *Coleman* [*v. Thompson*], 501 U.S. [722,] 731-732, 111 S.Ct. 2546, 115 L.Ed.2d 640 [(1991)]. The procedural default doctrine thus advances the same comity, finality, and federalism interests advanced by the exhaustion doctrine. See *McCleskey v. Zant*, 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

*Davila v. Davis*, 582 U.S. 521, 527 (2017). "[A] federal court may not review federal claims that

were procedurally defaulted in state courts." *Theriot v. Vashaw*, 982 F.3d 999 (6th Cir. 2020), citing *Maslonka v. Hoffner*, 900 F.3d 269, 276 (6th Cir. 2018) (alteration in original) (quoting *Davila v. Davis*, 582 U.S. 521, 527(2017)). *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Barton v. Warden, S. Ohio Corr. Facility,* 786 F.3d 450, 464 (6th Cir. 2015), *Guilmette v. Howes,* 624 F.3d 286, 290 (6th Cir. 2010)(*en banc*); *Eley v. Bagley*, 604 F.3d 958, 965 (6th Cir. 2010); *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594, 601-02 (6th Cir. 2001); *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>                    . . . .
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); accord, *Hartman v. Bagley,* 492 F.3d 347, 357 (6th Cir. 2007), *quoting Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).   A habeas petitioner can overcome a procedural default by showing cause for the default and prejudice from the asserted error.  *Atkins v. Holloway*, 792 F.3d 654, 657 (6th Cir. 2015).

Ohio has a relevant procedural rule: parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Glaros*, 170 Ohio St. 471 (1960), paragraph one of the syllabus; *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998).

Because trial counsel failed to object, the Tenth District reviewed this claim only for plain error. An Ohio state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *Wogenstahl v. Mitchell*, 668 F.3d 307, 337 (6th Cir. 2012); *Jells v. Mitchell,* 538 F.3d 478, 511 (6th Cir. 2008); *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir. 2006); *White v. Mitchell,* 431 F.3d 517, 525 (6th Cir. 2005); *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005); *Hinkle v. Randle*, 271 F.3d 239 (6th Cir. 2001)

Ohio's contemporaneous objection rule is an adequate and independent state ground of decision. *Wogenstahl v. Mitchell*, 668 F.3d 307, 334 (6th Cir. 2012), *citing Keith v. Mitchell*, 455 F.3d 662, 673 (6th Cir. 2006); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir. 2010); *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007); *Biros v. Bagley,* 422 F.3d 379, 387 (6th Cir. 2005); *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000), *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000); *Goodwin v. Johnson*, 632 F.3d 301, 315 (6th Cir. 2011); *Smith v. Bradshaw*, 591 F.3d 517, 522 (6th Cir.), *cert. denied*, 562 U.S. 876 (2010).

Ineffective assistance of trial counsel can constitute excusing cause for a procedural default. However, the ineffective assistance claim cannot be presented as cause if it was itself procedurally defaulted in the state courts, unless one of the standard excuses for that procedural default exists, to wit, actual innocence or cause and prejudice. *Edwards v. Carpenter*, 529 U.S. 446 (2000); *Chase v. MaCauley*, 971 F.3d 582, 592 (6th Cir. 2020); *Scuba v. Brigano*, 527 F.3d

479, 488 (6th Cir. 2007). Messenger presented this claim of ineffective assistance of trial counsel

on direct appeal to the Tenth District.  That court denied relief, applying the controlling federal

standard from *Strickland v. Washington*, 466 U.S. 668 (1984), and holding:

> **B. Objection to Evidence of Incarceration**
>
> {¶ 67} Messenger's second allegation of ineffective assistance of counsel is his trial counsel's failure to object to the evidence of his pre-trial incarceration. This argument reflects the argument Messenger made under his third assignment of error on appeal. Though we reviewed Messenger's third assignment of error under a plain error standard, we determined in resolving his third assignment of error that the admission of the evidence of Messenger's pre-trial incarceration was not error, let alone plain error. Thus, an objection as to the admissibility of this evidence would not have been successful, and Messenger's trial counsel was not deficient in failing to object to the admissibility of the evidence. [Citations omitted]

*Messenger, supra*.

The Magistrate Judge concludes this is an objectively reasonable application of *Strickland*

because it cannot be ineffective assistance of trial counsel to fail to make an objection which would

not and should not have been sustained.  Thus Messenger's procedural default in failing to object

is not excused by ineffective assistance of trial counsel.

Messenger's Second Ground for Relief is barred from merits review by his procedural

default in presenting it to the Ohio courts.

The Magistrate Judge also agrees with the Tenth District that any objection should have

been overruled.  Samantha's relationship with Messenger, a relationship which had led to the fatal

confrontation, had an obvious bearing on her credibility.  The fact that she reinforced that

relationship with fifty-nine visits to Messenger between the event and trial was highly relevant and

would have led any reasonable observer to doubt her truthfulness about their discussions.  Since

Messenger was her lover, she had an obvious interest in his prevailing at trial.  The trial judge's

24

jury instruction on the presumption of innocence would have cured any potential prejudice.

State court evidentiary rulings are rarely the basis for habeas corpus relief:

> With regard to evidentiary rulings, the standard for habeas relief is not easily met. "[F]ederal habeas courts review state court evidentiary decisions only for consistency with due process." *Coleman v. Mitchell,* 268 F.3d 417, 439 (6th Cir. 2001). "A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights." *Coleman v. Mitchell,* 244 F.3d 533, 542 (6th Cir. 2001). Moreover, such rulings "are usually not to be questioned in a federal habeas corpus proceeding." *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir.1988)). Even if errors are made in the application of state law, "[such] errors . . . especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus." *Walker v. Engle,* 703 F.2d 959, 962 (6th Cir.), cert. denied, 464 U.S. 962, 104 S. Ct. 396, 78 L. Ed. 2d 338 (1983). If a ruling is especially egregious and "results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir 2003) (citing *Coleman*, 244 F.3d at 542). Importantly, however, as a general matter, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff,* 518 U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996)). Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause. *Id.*

*Wilson v. Sheldon,* 874 F.3d 470, 475-76 (6th Cir. 2017).

In this particular case since trial counsel made no objection, the judge would have had to raise *sua sponte* an objection to the reference to Messenger's incarceration. That would likely have called particular attention to the pre-trial incarceration and thus been more prejudicial than the basically offhand remark about where Samantha and Messenger met.

Messenger's Second Ground for Relief is both procedurally defaulted and without merit. It should be denied.

25

**Third Ground for Relief: Ineffective Assistance of Trial Counsel**

In his Third Ground for Relief, Messenger claims he received constitutionally ineffective assistance of trial counsel as follows:

I. Defense counsel erred by failing to renew an objection to the admission of photographs of the deceased.

II. Defense counsel failed to object to testimony and evidence regarding Petitioner's pretrial incarceration.

III. Defense counsel failed to object to evidence regarding the search warrant.

IV. Defense counsel erred by permitting the coroner to testify as the last witness in the
     I.trial.

V. Defense counsel failed to object to repetitive photos and videos of the deceased.

VI. Defense counsel failed to object to lay opinion testimony.

VII. Defense counsel failed to object to evidence of character and conduct of witness.

VIII. Defense counsel failed to object to testimony about Petitioner owning multiple guns.

IX. The cumulative effect of defense counsel's errors resulted in Petitioner being denied

a fair trial.

Applying *Strickland*, the Tenth District rejected each of these claims. Respondent defends on the ground that each of those decisions was an objectively reasonable application of *Strickland*. Having reviewed each of these ineffective assistance of trial counsel sub-claims, the Magistrate Judge agrees that the Tenth District's decision is an objectively reasonable application of *Strickland*.

With respect to the first sub-claim, the trial court, having carefully considered these photographs in the first instance, was unlikely to change his mind. Accommodating the illness of a deputy coroner witness seems only common courtesy; there is no suggestion that the illness was

26

feigned so as to gain a tactical advantage. The supposedly objectionable lay opinion testimony did not substitute for expert opinion testimony on the same subject which would have been of marginal relevance. Instead, it conveyed an observation about how swiftly Messenger fired which would not have been objectionable. The Traverse offers no comment on the claim about failing to object to testimony about how Ms. Lape knew the victim. The comment about Messenger's having owned more than one gun appears to have been volunteered by the witness but responsive to the question she was asked. Failing to object could well have been a wise tactical decision because it could have focused the jury's attention on Messenger's conduct.

As authority for granting habeas corpus relief on the basis of cumulating instances of ineffective assistance of trial counsel, Petitioner cites *Mackey v. Russell*, 148 F. App'x 355, 365 (6th Cir. 2005), which as an unpublished circuit court decision is not controlling precedent. In *Mackey* the circuit court found that cumulative effect of defense counsel's failing to request a limiting instruction as to defendant's prior bad acts, failing to object to lengthy testimony as to the number of guns in defendant's house, and failing to object to prosecution's mention of defendant's post-arrest silence warranted habeas corpus relief. In this case neither the Tenth District nor the undersigned have found instances of ineffective assistance of trial counsel to cumulate, whereas defense counsel's failure to object to comment on post-*Miranda* silence in *Mackey* seems far more prejudicial. On balance the Magistrate Judge concludes the Tenth District's application of *Strickland* is objectively reasonable and therefore entitled to deference.

**Conclusion**

Based on the foregoing analysis, the Magistrate Judge concludes Petitioner is not entitled

to habeas corpus relief and recommends the Petition be dismissed with prejudice.  Because reasonable jurists would not disagree with this conclusion, it is also recommended that Petitioner be denied a certificate of appealability and that the Court certify to the Sixth Circuit that any appeal would be objectively frivolous and should not be permitted to proceed *in forma pauperis*.

May 14, 2025.

s/ *Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. #